DECISION
This case presents the Court with the question of whether Kathy and David Mignacca and their four minor children may lawfully keep Sonny, their miniature horse, at the family's residence in the Ridgewood subdivision of western Cranston. The Mignacca family, the Ridgewood Homeowners Association and those property owners and residents of the Ridgewood subdivision who contend the Mignaccas cannot lawfully harbor Sonny have brought the controversy before the Providence County Superior Court by way of two paths.
On April 11, 2001, the Zoning Board of Review of the City of Cranston, after hearing from the Mignaccas, Rena Dresseler, the president of the Ridgewood Homeowners Association and a vigorous opponent of Sonny's residing in Ridgewood, as well as other persons supportive of and opposed to the Mignaccas' position, granted the Mignaccas' petition for a variance and allowed them to keep Sonny on their nearly four acre lot, subject to certain conditions. From that decision, the RidgewoodHomeowners Association, Ms. Dresseler and others claimed an appeal to this Court. On the 22nd day of May, 2001, the Ridgewood Homeowners Association, Rena Dresseler and other individual homeowners from Ridgewood went on the offensive against the Mignaccas and Sonny, and filed a verified complaint seeking injunctive relief to bar the Mignaccas from keeping Sonny on their property and from erecting and maintaining a shed to shelter the miniature horse, the plaintiffs' contention in this suit being that restrictive deed covenants prohibited Sonny from being kept in Ridgewood. A temporary restraining order was issued by this Court May 23, 2001 enjoining the Mignaccas from keeping Sonny on their property until the matter was finally adjudicated on the merits. A counterclaim challenging the keeping of any animals by the plaintiffs, other than cats and dogs, was filed by the Mignaccas on July 11, 2001.
On June 27, 2001, the parties and their attorneys appeared in this court prepared to try the equitable matter, not just on the question of a preliminary injunction but on the merits, pursuant to Rule 65 of the Rhode Island Rules of Civil Procedure. On July 2, 2001, the zoning case and the equity case were consolidated for trial on the merits, with the attorneys for the Mignaccas, the Ridgewood Homeowners Association and individual members of the association who have joined in the litigation, and the Cranston Zoning Board of Review, all concurring that this was the appropriate way to proceed. It is well established, of course, that equity seeks to avoid a multiplicity of suits and that R.I.G.L. § 8-13-2, the legislative grant of equitable powers to the Rhode Island Superior Court, provides for consolidation of all matters arising out of the same occurrence or transaction. See also Rule 42, Super. R. Civ. P.
This Court, sitting without a jury, took testimony during a number of half-day sessions, commencing on June 27, 2001 and ending on July 12, 2001. The principal facts of significance are not 2 in dispute; and indeed, counsel for the Mignaccas and for the Association have stipulated to a number of facts.
Christian Mignacca, the nine-year old son of Kathy and David Mignacca, was the first to testify in this matter, and I find his testimony to be credible and trustworthy. Christian answered all questions put to him by counsel and the Court in a forthright and articulate manner. He spoke of his involvement with the training of Sonny during Sonny's stay of approximately thirty days at his home before the issuance of the temporary restraining order; and he discussed the behavior of the miniature horse both while it is housed on the Mignacca property and when it participates in horse shows and competitions at venues designed for that purpose. Christian explained that he has won a number of ribbons while competing with Sonny against other miniature horses and their masters. While Kathy Mignacca and Christian's sister, Nicole, also participate with Sonny in such contests, it is clear that Christain's involvement with the training and showing of the little horse is significant. Christian also discussed his physical limitations resulting from bacterial meningitis when he was two.
From Kathy Mignacca, whom I also find to be a credible witness, Christian's activities with Sonny were confirmed, and the Court was also told that Christian's involvement with Sonny and the miniature horse competitions has been a great source of enjoyment and satisfaction for the boy, and indeed has been helpful for his confidence and self-esteem, given the fact that his early childhood bout with the often fatal disease of bacterial meningitis has left Christian with scarring over much of his body, including his face and arms, and with weakened legs that require him to wear braces frequently. His weakened limbs preclude him from participating in other competitive sports appropriate for his age, such as baseball, soccer or football, and he finds the delights and challenges of competition in the horse shows he enters with Sonny.
Regarding Sonny himself, the Court learned of his behavior, habits and growth potential from Christian and Kathy Mignacca, and had the opportunity to observe Sonny on the Mignacca property during a view on July 6, 2001. Sonny's shoulders will never be higher than 3 feet from the ground and his weight will never exceed 150 pounds. The animal, by all descriptions, as well as by the Court's view on July 6, is gentle, amiable and not high strung or vicious in the least. His stature and weight will never reach that of a Great Dane, a Bull Mastiff, or a Saint Bernard; and it is unlikely that any training could make him into a guard or attack animal along the lines of a Doberman Pincher, a German Shepherd or a Pit Bull. Indeed, the popular name for this animal — "miniature horse" — is an apt one. When Shakespeare's Richard III cried out to his deity and the fates to supply him with a horse in return for his kingdom, if Sonny (or one of his ancestors) had appeared from the underbrush into the clearing, the distraught king surely would have uttered an Anglo-Saxon expletive that would make an Elizabethan audience blush and then fallen on his sword.[1] Alas, Sonny the miniature horse cannot be ridden nor used to pull a plow through a field.
The defendants also presented Anthony DelFarno, a Ridgewood neighbor, who testified that for nearly two years between 1998 and 2000, his family kept a miniature horse on his property, and that at least one board member, Laurie Biern, had seen the horse, Pogo. According to Mr. DelFarno, Ms. Biern liked the little animal, and he never received any complaint from the board of directors or any other person regarding his keeping the animal. He made no attempt to conceal the fact Pogo was on his premises, and the miniature horse could be viewed from the street.
In order to properly care for the horse, Mr. DelFarno converted a portion of his 15 x 25 foot shed into an appropriate place for Pogo. At some point, he received a letter signed by Ms. Dressler in her capacity as President of the Ridgewood Homeowners Association telling him that the shed was in violation of the restrictive covenant pertaining to the building of such structures, apparently, Section 6, which provides, among other things, that "no structure . . ., shack . . . or other outbuilding shall be used, placed, erected or constructed on any lot at any time either temporarily or permanently." Upon receiving the letter, Mr. DelFarno said that he called each member of the board, and none of them had any information or even noticed that there was any problem with his shed. As his testimony was uncontradicted, the only conclusion to be drawn by the Court is that Ms. Dressler, without advising other board members, took it upon herself to tell Mr. DelFarno that his shed was in violation of the restrictive covenant. For his part, Mr. DelFarno advised Ms. Dressler, and apparently anyone else with whom he spoke, that he would take his shed down only if the other cabanas, sheds, and outbuildings scattered throughout the subdivision were also removed by their owners. Mr. DelFarno opined that the homeowners association enforced its covenants arbitrarily.
In their case seeking equitable relief, the plaintiffs called no witnesses to the stand, though Rena Dresseler testified when called by the Mignaccas. Ms. Dresseler testified that she had occasionally heard Sonny neigh while she was on her property some three or four hundred feet away from where the Mignaccas keep Sonny in a fenced enclosure. It is difficult to believe that Sonny could be heard from that distance, as his neigh, such as it is, is more akin to a cat's meow and apparently does not occur very frequently according to Kathy Mignacca. When the group of approximately fifteen people who went on the Court's view approached Sonny in his enclosure, the sound made by the footfalls was noticeable and at least three persons in the entourage carried large television cameras on their shoulders.
This was probably not a sight that Sonny had encountered in the past, yet his reaction was one of silent indifference as he continued his equine ruminations. Counsel for the Association was invited by the Court to attempt to make Sonny emit a sound, but the invitation was declined. Kathy Mignacca declared that the horse would neigh usually when presented with food. In the presence of those who were attending the view, Kathy Mignacca entered the enclosure and offered food to Sonny, who obliged with a neigh — of the feline meow variety — which could barely be heard 20 feet away.
During her testimony, Ms. Dresseler also disclosed that at some point in the past, she had kept a 4 foot boa constrictor as a pet and was presently keeping on her premises three iguana lizards, and three or more stray cats that she regularly fed and who stayed under her outside deck. Additionally, she has on her premises two parrots.
During the view, Ms. Dresseler's residence was also visited by the Court and counsel for the Mignaccas and the Association. From her deck, one can look across the adjoining backyard and pool of the Nardolillo family and get a glimpse of portions of the Mignaccas' garages and the top of a slide that has been placed near their swimming pool. The Mignacca pool and house cannot be seen, nor can the enclosure and shed in which Sonny is kept. Sonny himself, could not be seen, but Ms. Dresseler ascribed that to the fact that a pile of dirt resulting from excavation in the Nardolillo's backyard obscured the view. As the fact finder, I conclude that even without the dirt in the way, the stands of trees, shrubs, bushes and plants on three parcels of land would make a view of Sonny difficult, if not impossible; and if one did chance to catch a glimpse of Sonny from the Dresseler deck, the miniature horse would appear as a tiny denizen of Lilliput, the island Gulliver visited in his famous travels. Sonny, it should be noted, is kept behind the Mignacca house and to the rear of their property, and cannot be observed readily, if at all, from the street. The Mignaccas have created for themselves, through planting 6 and landscaping, a park-like environment. All the houses in Ridgewood are what might be termed, by way of understatement, upscale and lavish. Ridgewood, in short, is a verdant and secluded enclave for some members of Rhode Island's economic aristocracy.
At several times during the course of these proceedings, counsel for Ridgewood and Ms. Dresseler argued that David and Kathy Mignacca were exploiting the afflictions of their son, Christian, in order to gain the favor of the Court, as well as popular sympathy by way of media manipulation, for whatever good that might gain them. The genesis of this contention apparently is Ms. Dresseler, who obliquely opined during her testimony at the zoning hearing that the Mignaccas were seeking to use the condition of Christian to gain the favor of the zoning board. (Tr. 22). Kathy Mignacca testified in this proceeding that she and Ms. Dresseler had a confrontation about this accusation after the Zoning Board of Appeals had taken testimony and rendered its decision. These suggestions by Ms. Dresseler and her lead attorney on this point are reckless, mean-spirited and not supported by one iota of evidence. On the contrary, the transcript of the April 11, 2001 zoning hearing demonstrates that from the outset Kathy Mignacca has been candid and forthright about the salubrious affect playing and working with Sonny could have on Christian. (Tr. 9, 13-14). This Court takes judicial notice of the emotional and physical well being animals kept as pets often bring to their human companions.[2]
But, while relevant, it is not the physical and psychological challenges that Christian confronts as a result of his bout with bacterial meningitis that govern the outcome of this case. The paramount concerns of this Court in resolving the controversy are the ordinances of the City of Cranston, the decisional law of the Rhode Island Supreme Court respecting restrictive covenants, and the principles and maxims of equity. Logic suggests that the first point of examination be the Cranston City Code, for if Sonny's residing with the Mignaccas is prohibited by the ordinances of Cranston, then an examination of the restrictive covenants is pointless.
 Land Use and Zoning Ordinances in Cranston
On April 11, 2001, the Mignaccas pressed their request pursuant to §§ 30-8 and 30-28 of the Cranston zoning ordinances before the Zoning Board of Appeal. Section 30-28 provides for a procedure to obtain variances and § 30-8 is a schedule of uses. Apparently the Mignaccas were concerned about permitted uses in an A-80 zone, which allows not only single-family residences on large lots but provides for the "raising and keeping of animals on not less than ten acres." The Board took testimony for and against the application, and learned, among other things, that Sonny would be kept in a 10 foot by 12 foot shed if the Board so permitted, would be spending his days in an enclosure bordered by a 500 foot fence that in turn was within the Mignaccas fenced-in property, and that Sonny required approximately one-half acre for his exercise. The Zoning Board of Review granted the request of the Mignaccas to keep Sonny on their property along with the 10 foot by 12 foot shed, subject to certain conditions; and the Board was specific in its decision that they had factored in the concerns of Kathy Mignacca for the well being of Christian. While the Board of Review did not fully explicate its decision, they granted a dimensional variance from the 10 acre regulation relative to "raising and keeping . . . animals", implicitly concluding that Christian would experience more than a "mere inconvenience." (R.I.G.L. § 45-24-41(d)(2)). One condition imposed by the Board was that the horse could remain "as long as [Christian] . . . is living there or no more than nine years whichever comes first. ."
A review of Cranston's ordinances reveals, however, that the Mignaccas are able to keep Sonny on their property without repairing to the Board of Appeals for a variance, as § 4-2.1 of the City 8 Code provides that horses may be kept in different sections of the city so long as sufficient acreage is available. Section 4-2.1 entitled "Keeping animals in certain districts prohibited," a certified copy of which was placed in evidence by the Court, provides, in pertinent part:
 No person shall keep any horse within any closely built-up residential area unless he shall have available, either through ownership or lease, at least 20,000 square feet of pasture area.
As an acre contains 43,560 square feet, and the Mignaccas have a four acre house lot, there does not appear to be any question but that they can keep a miniature horse on their property. The word "pasture" of course refers to grass growing on land that has not been tilled for cultivation and which is available for an animal to graze upon.
The City Council of Cranston was acting within powers delegated to it by the legislature when it passed § 4-2.1 respecting the keeping of a horse in a built-up residential area. R.I.G.L. 23-19.2-1 provides, in pertinent part:
 The councils of the several cities and towns may make such rules and regulations as they deem necessary to regulate and control the construction, location and maintenance of all places for keeping animals . . .
No authority has been presented to this Court that in any way suggests that either the zoning ordinances of the City of Cranston, the Cranston comprehensive plan or the statutory enabling legislation nullify the controlling force of § 4-2.1.
 Restrictive Covenants
I turn now to an examination of the restrictive covenants at issue in this controversy. The document containing all restrictive covenants pertaining to the parcels located in Ridgewood Estates is Exhibit A in the consolidated action.
Restriction 8, titled "Livestock and Poultry", provides in its entirety:
 No animals, livestock or poultry of any kind shall be raised, bred, or kept on any lot, except that two (2) dogs and/or two (2) cats may be kept provided that they are not kept, bred or maintained for any commercial purpose. No kennels or other structure for the keeping of such pet shall be maintained on the premises.
The plaintiffs also rely on Restrictive Covenant 5, which defines nuisances; and after amending their complaint, the plaintiffs sought to demonstrate that the Mignaccas used offensive construction or lawn machinery and recreational vehicles on their land, in addition to keeping Sonny. Restrictive Covenant 5, titled "Nuisances", provided in its entirety:
 No professional, trade, business or commercial enterprise of whatsoever nature may be conducted or operated on the granted premises. No substance, thing or material shall be kept of used on any lot which will emit foul or obnoxious odors or that will cause any noise that will or might disturb the peace, quiet, comfort or serenity of the occupants of the surrounding property.
It is necessary for this Court to determine the intended scope of Restrictive Covenant 8. Rena Dresseler and the Ridgewood Homeowners Association argue strenuously that Sonny should be placed under the category of "livestock" and therefore cannot be kept on the Mignaccas' Ridgewood property. Our legislature has seen fit to define the term "livestock" in contradistinction to the word "pet" in an effort to categorize different members of the animal kingdom. In R.I.G.L.4-13-1.2(5), we find the following definition of livestock:
 "Livestock" means domesticated animals which are commonly held in moderate contact with humans which include, but are not limited to, cattle, bison, equines, sheep, goats, llamas, and swine. (emphasis supplied) R. I. G. L. 4-13-1.1(8) favors us with us a definition of pets:
 "Pets" mean domesticated animals kept in close contact with humans, which include, but may not be limited to dogs, cats, ferrets, equines, llamas, goats, sheep, and swine (emphasis supplied.)
It appears, then, that the legislature recognized that horses — as well as some other animals such as, llamas, goats, and even swine — can be categorized as either livestock or pets, the different labels to be applied according to the degree of contact the animal has with humans. In the instant matter, it is clear that Christian, and some other members of his family, have close contact with Sonny and treat him as a pet as they engage in almost daily routines with him involving feeding, training, grooming, playing and showing in horse competitions.
In addition to their contention that Sonny must be placed under the rubric "livestock", the plaintiffs argue that this restrictive covenant must be read to bar the keeping of any animals except two dogs and/or two cats per lot on property situated in Ridgewood.
In seeking to determine the intent of the drafter of this covenant, the principles of statutory construction as enunciated by the Rhode Island Supreme Court and other authorities provide a guide.One rule of construction is that "general terms be construed as limited by more specific terms." Montaquila v. St. Cyr, 433 A.2d 206, 214 (1981). It appears that the all-inclusive term "animal" has been limited by the words used in the title of the covenant, "Livestock and Poultry," and further limited by the use of those same words following immediately upon the use of the word "animal" in the text. Also apposite is the "principle of noscitur a sociis, that the meaning of one word can become clear by reference to other words associated with it in the statute . . ." Berthiaume v. School Com. of Woonsocket, 121 R.I. 243, 248 (1979).[3]
Naturally, to resolve ambiguities or a lack of clarity of intent, the restrictive covenant must be read in its entirety and harmonized with every other covenant in the deed. The plaintiffs pled that they perceived a breach of the livestock and poultry provision (Restrictive Covenant 8) and also pled that the Mignaccas were in violation of the nuisance provision (Restrictive Covenant 5) in keeping their horse and shed on their land. Not one shred of evidence was produced suggesting that either Sonny or the 10 foot by 12 foot shed produced any sort of nuisance, either by way of emitting noxious odors, disturbing the peace or by creating an eyesore. This Court can judicially note that a greater noise level than could ever be generated by Sonny would result from any number of usual Ridgewood activities, such as backyard barbecues, teenager pool parties, barking dogs and the chirping of crickets after dusk.
I conclude that the intent of the drafter of Restrictive Covenant 8 was to provide the residents and potential residents of the Ridgewood development from having a neighbor or neighbors engage in the business of keeping and raising animals in a farm-like setting for commercial purposes, i.e., the raising of chickens for their eggs and meat, the raising of cattle for dairy products, the maintaining of a horse stable for riding lessons and to make a profit by boarding other people's horses, etc.
Additionally, the covenant is unclear as to whether such animals as are barred by Restrictive Covenant 8 are precluded from only the outside of a dwelling place or whether they are barred from the inside as well. The lead individual plaintiff, Rena Dresseler, asserts a right to keep parrots, lizards and snakes within her house, claiming that Restrictive Covenant 8 applies only to land outside the house. This viewpoint is mistaken and not supported by the language of the covenant. At best, the covenant is ambiguous as to the scope of its application, as the use of the words "lot" and "premises" within the covenant do not by and of themselves bespeak of any distinction between the area situated inside the house and that located outside. Controlling authority of our Supreme Court directs how this ambiguity is to be resolved:
. . . the general rule concerning restrictive covenants is that they are to be construed strictly so as to favor an unrestricted use of property, are not to be extended by implication, and if there is ambiguity, it is to be resolved in favor of an unrestricted use. Emma v. Silvestri, 101 R.I. 749, 751 (1967).
Following Emma, this Court concludes as a matter of law that such animals as may be kept at the residences in Ridgewood may be kept either inside or outside the actual dwelling in the discretion of the owners.
This parsing of the language of the restrictive covenants and an examination of the entire document creating these deed restrictions is consonant with the law governing judicial scrutiny of such documents, as found in Gregory v. State, Dept. of Mental Health, Retardation and Hospitals, 495 A.2d 997 (R.I. 1985) and DeWolf v. Usher Cove Corp.,721 F. Supp. 1518 (D.R.I. 1989). Of particular concern to this justice is the mandate that "restrictive covenants are to be strictly construed in favor of the free alienability of land while still respecting the purposes for which the restriction was established." Hanley v. Misischi,111 R.I. 233, 238 (1973). Also, because of the different fact patterns that emerge in each dispute regarding land use and plats or subdivisions subject to restrictive covenants, these controversies must be decided on a case-by-case basis. Hanley, 111 R. I., at 238. And as former Chief Judge Pettine wrote in DeWolf, after surveying Rhode Island law, restrictive covenants should 13 generally be viewed "as creating a valid contractual relationship so long as they are not contrary to public policy or law or are not unreasonably or arbitrarily enforced." DeWolf, 721 F. Supp., at 1528.
In addition to containing the ambiguities already discussed above, the restrictive covenants involved in this matter, especially Restrictive Covenant 6, "Temporary Structures" and 8, "Livestock and Poultry", have been enforced arbitrarily or not at all. Rebuttal witnesses called by the plaintiff testified to the effect that the original developer went bankrupt around 1994 and from that time forward there was no mechanism for the enforcement of the covenants. This meant that during this time people could build on their property and keep animals in violation of the restrictive covenants. Indeed, during the view, freestanding garages, as well as in one case a garage built under a house, all in contravention of the restrictive covenants, were observed, as was a driveway built without regard to the specifications found in the covenant. Testimony was presented by witnesses for both the plaintiff and the defendant that indicated the existence of sheds and cabanas throughout the plat in violation of the covenants, at least according to the perception of the person giving the testimony. None of these covenant "violations" seemed to detract in any way from the manicured and upscale ambiance of the neighborhood. However, the rebuttal witnesses were mistaken in their declarations that as residents of Ridgewood they were powerless to enforce any perceived violations of the covenants until the plaintiff Homeowners' Association was created around 1998. As the Rhode Island Supreme Court said in Houlihan v. Zoning Board of New Shoreham,738 A.2d 536, 538 (1999):
 This court has long recognized that when recorded plat-lot restrictions appear intended to provide for a uniform development and use of platted subdivision lots, any one of the plat-lot owners may seek judicial assistance to compel compliance of another lot owner with the restrictive covenants.
In effect, between 1994 and 1998 there was a holiday in Ridgewood from the mandates of all the restrictive covenants. While an expert real estate broker and appraiser, one Donald Coletti, called by the plaintiffs, testified as to the efficacy of restrictive covenants in preserving the character of a neighborhood, he had nothing to say about the deleterious affects of any specific violations on Ridgewood. He further testified that he had participated in the transfer of the Mignacca home from its former owners, and that he from time to time engaged in the sale of other homes in this section of Cranston. At the time he testified, he was trying to sell a home in Ridgewood Estates and had not been able to bring about the sale as quickly as he would have liked; but none of this was attributed to the Mignaccas and their keeping of Sonny on their property, or to any other violation by any person regarding the restrictive covenants.
Not only was there a four year hiatus in the enforcement of these restrictions, though no resident of Ridgewood was obliged to stay his or her actions regarding any perceived violation, it is clear that the president of the association has kept animals on her property, the existence of which were known to other members of the association. As noted above, the DelFarno miniature horse, Pogo, was also known to at least one member of the board of directors of the association and presumably known to many other residents of the subdivision, as the animal was observable from the street. The board member, Laurie Biern, testified that she believed the horse was there for only three months and that the reason she did not report it was that she thought the DelFarnos were simply taking care of the horse for a short period of time as an act of mercy because the horse, according to Ms. Biern, was undernourished when the DelFarnos acquired it. She described herself as an animal lover who regularly takes in stray animals, including "wild cats" in order to nurse them to health.
This Court concludes that the restrictive covenant relative to livestock and poultry is now being applied arbitrarily to the Mignaccas. There is no exception in Restrictive Covenant 8 that provides for miniature horses to be kept so long as they are being nursed to health. In fact, as Rene Dressler testified, there are no written rules, regulations, or guidelines of any type or description that contain criteria as to when an exception may be granted relative to the enforcement of Restrictive Covenants 5, 6 and 8. As I indicated above, the intent of the drafters of the restrictive covenants was not to bar a pet such as Sonny, but rather to prohibit cattle and horse farms, chicken coops and the like. Nonetheless, another factor in this Court's decision is the arbitrary enforcement, or non-enforcement, of the covenants.
 Equity
The keeping of animals other than dogs and cats by Rena Dresseler, the regular harboring of animals by Ms. Biern, including a litter of "wild cats", the keeping of more than two dogs or two cats by other residents of Ridgewood, and the failure of any action to be taken against the DelFarnos and "Pogo" by the plaintiffs, not only show an arbitrary enforcement of Restrictive Covenant 8 but place in front of the plaintiffs an insurmountable barrier regarding the equitable maxim, "He (or she) who seeks equity must do equity." This maxim is not to be confused with the clean hands doctrine.[4] The fundamental equitable maxim that I rely upon declares, in effect, that one who seeks to invoke the equitable and extraordinary injunctive power of the court relative to a claimed covenant violation cannot himself or herself be in violation of that same restriction, or have ignored other similar violations by other persons. It would be manifestly unfair for members of the association or other residents of Ridgewood to keep snakes or parrots or three dogs while denying Christian and the Mignaccas a right to keep their miniature pet horse Sonny. Moreover, the plaintiffs have not proved harm — let alone irreparable harm — to their respective properties or to any rights they enjoy. The plaintiffs would like this Court to believe that without injunctive relief the Mignaccas' property will have the appearance of a cross between Old MacDonald's Farm and Noah's Ark situated on Tobacco Road, but nothing in evidence suggests this.
"The decision to grant or deny an injunction is a matter within the sound discretion of the trial court." Paramount Office Supply Co. v. D. A. MacIsaac, Inc., 524 A.2d 1099, 1101 (R.I. 1987). Putting aside for the moment my analysis of the restrictive covenants that appears above, the plaintiffs have not produced any evidence whatsoever that indicates that Sonny and the shed he uses constitute a nuisance. In my view, it is doubtful that he can be heard beyond the boundaries of the Mignacca lots, and if his gentle whinny happens to ride a breeze on to some neighbor's property the sound will be barely audible, and certainly not anywhere as loud as the barking of even a small dog. There was no testimony as to any odors coming from Sonny or the manure he generates; and this is not surprising as the horse during the view was immaculately groomed; and Ms. Mignacca testified that the manure is collected regularly by the family and kept in sealed bins (which were displayed on the view) until its removal from the property. No evidence was produced indicating that Sonny's presence will in any way inhibit neighbors from the free and untrammeled use of their own property, nor will his presence diminish property values. Balancing the equities — and again keeping to one side my determination that Restrictive Covenant 8 does not preclude the keeping of a miniature horse — none of the plaintiffs experiences any hardship by the Mignaccas keeping Sonny. Balancing the equities, the Mignaccas have found a gentle pet and wholesome activity for Christian, whose weak legs, problematic growth plates 17 and braces prevent him from participating in other competitive activities, such as baseball and football, with his friends and other children of his age, and this clearly outweighs the undifferentiated fears of the Homeowners Association and the individual plaintiffs.
Plaintiffs argue strenuously, but without supporting evidence, that Sonny will drive down property values, if not throughout the development, at least regarding nearby homes. Based on the evidence presented before this Court, Sonny's presence will cause no such problem; but it is likely that if the Ridgewood Homeowners Association develops a reputation that its leadership is unnecessarily and unreasonably zealous and brings homeowners to court for unobtrusive activities designed to meet the needs of a special child, then the owners in Ridgewood may find the marketability of their premises declining. Nothing in this decision is meant to suggest that Christian, or any other child living in Ridgewood, can flaunt clear, sound and appropriate restrictive covenants. If Christian wished to keep a herd of cattle because he and his parents thought it in his best interest to do so, or if he and his parents concluded that playing the drums in his backyard at one o'clock in the morning was a satisfying and beneficial activity, he would find no protection in this Court. He and his family are protected here today for the reasons set forward above. Accordingly:
(1) In Ridgewood Homeowners Association, et al. v. Cranston Zoning Board, et al., 01/PC-2241, pursuant to R.I.G.L. 45-24-69(d), this Court affirms the ultimate decision of the Cranston Zoning Board of Review respecting the lawful right of the Mignaccas to keep Sonny on their property and house him in the shed they erected for that purpose, but the case is remanded and the Cranston Zoning Board of Review is directed to declare in their decision in their record of this case that because the Mignaccas have well in excess of 20,000 square feet on which to permit Sonny to amble and graze, Cranston Ordinance 4-2.1 precludes the necessity of granting a dimensional or any other variance to the 18 Mignaccas, as that ordinance allows the keeping of a horse, even in a built-up area, so long as the owner has more than 20,000 square feet for use as a pasture.
(2) Because Restrictive Covenant 8 does not apply to Sonny, the pet miniature horse, and because a number of sheds and cabanas exist throughout Ridgewood in apparent violation of Restrictive Covenant 6, which permits no exceptions, the temporary restraining order earlier issued in this matter is vacated; and the Mignaccas may keep Sonny on their property and house him in the ten by twelve shed that exists there; and if further construction is required to complete the shed, the Mignaccas may undertake that;
(3) The counterclaim brought by defendants is denied, as there has been no showing that any of Rena Dresseler's animals are either proscribed by Restrictive Covenant 8 or constitute a nuisance under Restrictive Covenant 5; similarly, the plaintiffs are denied injunctive relief regarding defendants' pet ducks, rabbits and fish, none of whom have been proved to be a nuisance;
(4) Counts 5 through 14 of the plaintiffs' amended complaint are denied for failure of proof; and this Court finds as a matter of fact that the defendant Mignaccas maintain their property in a neat and pristine way and keep it within the tenor of the neighborhood; and the plaintiffs failed to show that any recreational vehicles or equipment used for excavation or lawn maintenance are occasionally visible from the street or readily visible by any abutting property owner; and they have failed to prove that if they are occasionally visible to the curious or the hyper-critical they constitute a violation of any restrictive covenant or an eyesore; and indeed, most of the objects complained of were stored in a garage, where there is ample room to store the other objects observed carefully parked in the driveway;
Final judgment reflecting this decision shall enter today.
[1] "A horse! A horse! My kingdom for a horse!" from William Shakespeare, King Richard III, Act V, Scene 4.
[2] A number of scientific studies have confirmed what any casual observer of pets interacting with humans should know. See, e.g. Alan M. Schoen, Kindred Spirits: How the Remarkable Bond Between Humans and Animals Can Change the Way We Live (2001).
[3] A scholar of the rules of interpretation provides useful instruction: "Noscitur a sociis", the most sonorous of the canons of construction, is also the most obscure. It is often confused with ejusdem generis even by those who should know better. Whereas ejusdem generis tells us how to find items outside the list expressed in the statute, noscitur a sociis tells us how the list gives meaning to the items within it. Michael Sinclair, A Guide to Statutory Interpretation (2000).
[4] See, e.g. John Pomeroy, II Trestise in Equity Jurisprudence, (1941 ed.) Pomeroy declared this maxim to be "the foundation of all equity", p. 51, and treated it in a separate section, Section III, from that in which he examined "clean hands." Section IV.